SETH S. SERAT, doing business as the STAR COAL COMPANY, Respondent, v. B. F. FEAGANS, Appellant.

Kansas City Court of Appeals, February 3, 1913.

1. **SALES: Account: Evidence.**  Where defendant admits that, every time he ordered coal shipped to him, an acknowledgment of the order was sent him by the vendor in which were stated the number of cars, character of coal, the date when to be shipped, and the price per ton, and further admits that, when the shipment was made, an invoice was sent to and received by

him, in which were stated in detail the date, the car number, the weight of the coal, the price per ton, and the total amount due, all of which corresponded to the items set out in the account sued on, this establishes, prima facie, a separate sale of each car of coal at the prices stated in the invoices.

2. ———: Purchase Under One General Contract: Burden of Proof. Under the above circumstances, if the vendee claims the coal was purchased under one general contract to furnish all coal desired by him for a specified purpose at a different price, the burden is on him to establish it by the clearest proof, since it is in direct conflict with dealings actually had between them.

3. CONTRACTS: Offer of Terms: Acceptance. Where one party offers to furnish coal at a certain price and under one general contract, the offer, to become binding, must be accepted within a reasonable time and the vendor notified thereof. If this is not done, there is no contract and vendor is at liberty to withdraw offer.

4. ———: Construction of: Court or Jury. The construction to be placed on undisputed written correspondence is usually for the court and not the jury. This may not be a universal proposition since there may be cases in which on account of ambiguity in the language used, it should be left to the jury to say whether a reasonable man would be justified in treating it as a contract. But, even if the writing be ambiguous, when the admitted facts show that both parties treated it as not constituting a contract, the court is justified in construing it the same way.

5. ———: ———: Question for Jury. Where contract rests, partly in writing and partly in parol, and the parol portion is disputed, court must submit question of contract to jury.

6. ———: ———: Establishment of. Where defendant claims that a contract was created partly by letter and partly by a telephone conversation which is denied, it is incumbent on the defendant to show what was said in such telephone conversation, not merely his conclusion thereon. Nor will vague and uncertain testimony thereon be sufficient, if its purpose and effect be in conflict with the undisputed course of dealing between the parties.

Appeal from Johnson Circuit Court.—*Hon. A. A. Whitsett*, Judge.

Affirmed.

*Jas. A. Kemper* for appellant.

*J. W. Suddath & Son* for respondent.

TRIMBLE, J.—This is a suit on account by respondent for nineteen carloads of coal and slack sold and delivered to appellant on different dates between September 30, 1909, and March 21, 1910, amounting to $1596.37 on which ten payments were made at different times between November 17, 1909, and April 16, 1910, aggregating $1200 leaving a balance due of $396.37 judgment for which was asked with 6 per cent interest from May 3, 1910. The account set out the dates each car was sold, the number of the car, number of tons in each, the price per ton, the amount due on each car at the price named, and the kind of coal in each.

It was shown in evidence that each car in the account was shipped upon a written order in the form of a letter from appellant; that, as soon as an order from him was received, an acknowledgment thereof was sent to and received by him in which was stated the number of cars, the character of coal, when same was to be shipped, *and the price per ton thereof*, exactly corresponding to those same items in the account; that, as soon as each car called for in the order had been loaded and weighed, an invoice was sent to and received by appellant which set forth in detail the date, the car number, the weight of the coal, *the price per ton*, and the total amount due, exactly corresponding to those same items set out in the account. Appellant admitted receiving these acknowledgments and invoices as they were sent; admitted that the cars as set out in the account were shipped on the dates specified and were received by him. He also admitted that he noticed the price per ton stated in the acknowledgments and invoices but made no objection thereto, and made no claim that the prices therein stated were too high or that they were governed by the contract until May 21, 1910, which was two months after the last car in the account had been shipped to and received by him.

His defense is that he did not make a separate purchase of each car, but that the coal was all bought under one contract to furnish him coal at a price less than that charged in the account; that this contract was made, by both parties hereto, in view of the fact that appellant was about to secure the contract for furnishing the Warrensburg Normal School with fuel for the winter, and that respondent agreed to furnish enough to enable him to fill that contract; that, relying on his contract with appellant whereby he could obtain coal at a certain price and of sufficient quantity, he made a contract with the Normal and gave bond for his compliance therewith; that, at the price authorized by the contract, the payments made by him, aggregating $1200, more than paid for the coal sold; that owing to the failure of respondent to furnish enough coal to enable appellant to fill his Normal contract he was required to buy higher coal elsewhere and pay higher freight rates to his damage in the sum of $205.13, for which he asked judgment in a counterclaim.

There being no question but that appellant received the cars of coal sued for, and that upon every order sent in by him respondent shipped the cars called for, his exemption from liability under the petition, as well as his right to recover on his counterclaim, depends upon whether there was a contract to furnish all the coal needed for the Normal at the price claimed by appellant. If no such contract is shown, plaintiff must inevitably recover the amount due on the account.

The evidence relied upon to show one contract covering all the coal consisted of correspondence between the parties which is substantially as follows: About July 20, 1909, appellant wrote respondent telling him he was going to figure on the Normal contract and asking for prices on Weir City coal. Respondent replied July 20, 1909, that, if the inquirer

was in a position to give him shipping instructions during July, August and September, he would make a price of $1:75 per ton f. o. b. the mine and a price based on the market on orders placed thereafter with a maximum of $2 per ton, and followed this with another letter on July 27, 1909, making a price during July, August and September of $1.75 per ton on Weir City lump coal and after September until April 1, 1910, a price of $2 per ton. On August 16, 1909, Feagans wrote respondent that he had secured the Normal contract for coal and that the school authorities would determine that week whether they would take Lexington lump or Weir City coal and that he would write as soon as they decided. This letter was not an out-and-out acceptance of respondent's offer but merely a notification that he had the contract and would write them further when he learned the kind of coal, the Normal wanted. To this respondent replied August 18, 1909, acknowledging notice that Feagans had secured the contract to furnish the Normal with coal and saying that he hoped to enable Feagans to do the proper thing with the State Normal business, which was only another way of saying he hoped Feagans would accept his offer. August 19, 1909, Feagans wrote acknowledging the respondent's letter of the 18th and asking if respondent could furnish him Cherokee lump and *at what price,* explaining that the janitor of the Normal thought that Cherokee was better for steam purposes than Weir City. To this respondent, on August 20, 1909, replied that he did not anticipate any trouble in giving either Cherokee or Weir City but rather thought he would be in better shape to give Cherokee and would like to have his order at the earliest possible moment, at the prices quoted in his letter of July 27, and closed by hoping this would be satisfactory and that he might have Feagans' order. Not hearing anything from Feagans

respondent on August 25 wrote him asking him when he expected shipments to begin to move on the Normal School contract. Still not hearing from Feagans, respondent, on the 30th of August, 1909, again wrote him asking for an order from him. On September 4, 1909, respondent again wrote Feagans saying he understood the Normal would take Cherokee together with a small amount of Lexington coal and expressed the hope that Feagans would arrange to place his order with respondent at once and closed by urging his prompt attention to the matter. To none of these did Feagans make any reply. On September 21, 1909, Feagans wrote ordering a load of Cherokee lump shipped on the 22nd and another on the 25th and followed it with a letter on September 24, 1909, directing two other loads to be shipped, one on the 27th, and the other on the 30th, and saying that he would write when he wanted more. To this respondent on September 25, 1909, replied as follows:

"Sept. 25, 1909.

Mr. B. F. Feagans,

     Warrensburg, Mo.,

Dear Sir:

   This will acknowledge receipt of your favor of the 21st, also of the 24th inst. requesting us to ship you all told four cars of Kansas lump coal to apply on the Normal School contract.

On Aug. 12 you called us up over the 'phone and stated that this business would come up in the next couple of days, and a few days later you called us up and advised that you had secured the business and we of course naturally expected to receive orders from you at once.

Not hearing from you within a reasonable time we wrote you under date of Aug. 25, Aug. 30, and Sept. 4, yet received no response whatever to our communications. We naturally took it for granted that you had

changed your mind and did not intend to give us the business.

Consequently, we made no preparation to take care of the same. As a matter of fact at the present time all mines on the Missouri Pacific are in a most deplorable condition on account of not receiving cars. What little coal is being loaded in the Southern Kansas district is taken by the railroads. Everyone is behind on their orders for shipment to Missouri Pacific closed points *and are only accepting orders subject to prices effective when the shipments are made.*

I could not give you any idea when we could ship this coal and believe it would be an injustice to accept the orders under the existing conditions.

However, if you can arrange to use Panama or Ovid, Missouri coal, which is nicely prepared lump, and in my opinion would fill the bill, we will protect you on a price of $1.60 f. o. b. mine, and have the shipments made at the earliest possible moment. As you doubtless know this coal is very similar in appearance to Southern Kansas.

Regretting the circumstances which have arisen, but over which I assure you we had no control, and awaiting your further pleasure in the premises, I am,

Yours truly,

E. R. Dusky,

General Sales Agent.''

The claim of appellant is that respondent's letter of July 27, together with that of August 20, as to terms, resulted in a contract between them for all coal needed for the Normal at the price stated therein. The respondent claims that the letters mentioned constituted merely a proposition that was never accepted on the part of Feagans. But whether a contract was effected or not is not very material since the letter of September 25, 1909, above set out declines to enter into any such contract on account of failure to hear from Feagans, and Feagans admits that the contract,

which he claims existed prior to this letter of September 25, was abandoned by mutual agreement but he asserts that in this letter a new contract was offered as a substitute whereby Panama or Ovid coal would be furnished instead of Weir City at $1.60 per ton; that this letter, together with a telephone conversation had between the parties on September 27, constituted a new contract under which he bought all the coal sued for. Respondent insists that the letter refers only to the four cars mentioned and not to all of the coal necessary to enable appellant to fill his contract with the Normal.

So that the question whether a contract was made depends upon the construction to be placed on the letter of September 25, and the evidence as to the conversation taking place over the telephone on the 27th.

At the close of the evidence the cause was submitted to the jury upon the instructions of the court that the defendant had no contract to furnish all the coal needed to fill his Normal contract and hence could not recover on his counterclaim, and if the jury found from the evidence that defendant ordered each of the cars of coal set out in plaintiff's petition and that plaintiff accepted each of the orders in writing stating therein the price at which accepted and afterwards sent defendant an invoice in writing when each car was shipped, stating the price per ton, the number of tons and the total price therefor, then the jury should find that each of the orders and acceptances constituted a separate complete contract, and the defendant immediately became indebted to plaintiff upon each of said shipments in the amount therein named, and is indebted to plaintiff in the aggregate amount of said shipments less the amount he has paid thereon, with interest at 6 per cent from May 3, 1910. The court refused defendant's instruction which submitted to the

jury the question whether there was a contract between plaintiff and defendant for Panama or Ovid coal in sufficient quantity to supply the Normal, during the school year, at $1.60 per ton. The jury returned a verdict for plaintiff for the balance due on the account with interest at 6 per cent from May 3, 1910, aggregating $431.05, and found for the plaintiff on defendant's counterclaim.

There is no dispute over the fact that demand was made on May 3, 1910, for the balance due on the contract. The undisputed testimony shows that respondent shipped more coal to appellant than the latter actually furnished the Normal. In fact, the only dispute in the testimony is on the question whether or not the telephone conversation of September 27, in connection with the letter of September 25, constituted a contract to furnish, at $1.60 per ton, the coal necessary for the Normal. The contention of appellant is that it was for the jury to say whether such telephone conversation created a contract, and his complaint is that the court improperly took this question from the jury.

So far as the construction to be placed upon the undisputed written correspondence is concerned, it was the court's duty to construe the letters and tell the jury their legal effect. This may not be true as a universal proposition since there may be cases in which, on account of the ambiguity of the language used, it should be left to the jury to say whether a reasonable man, would be justified in treating it as a contract. But, even if it be considered that the letter of September 27 is ambiguous as to what coal it referred to, yet when the admitted acts of both parties thereafter show clearly that they did not consider it covered all the coal necessary for the Normal, it is the duty of the court to construe the writing. The appellant, however, contends that his contract rests partly on the telephone conversation of September 27.

Undoubtedly, if any evidence at all exists tending to show what words were said in the telephone conversation which would create the contract apellant contends was made, then it was for the jury to say whether such words were said. And if that were the situation here, the court had no right to tell the jury appellant had no contract for the amount of coal and at the price he claimed. But a careful examination of the testimony shows that no evidence was given as to what was said over the telephone which either court or jury could say constituted a contract, or pieced out the letter of September 25, so as to make a contract. At most it is only plaintiff's conclusion that it made a contract. That this is true appears from the following testimony given by appellant on direct examination:

Q. Now, a letter mailed in Kansas City the 25th reaches here the next day? A. Yes, sir.

Q. I will ask you to state whether or not this gentleman here (referring to plaintiff's Sales Agent Dusky) called you by telephone on the 27th day of September and informed you, as he has said upon the witness stand that he couldn't furnish you the coal and would not furnish it to you? A. I don't know whether it was that day or not, sir.

Q. Well, when was it? A. I don' know, sir. A letter followed that, saying that the mine was in a deplorable condition; I don't know what time that followed that letter—what time the telephone message was received. Don't remember anything, about that but he writes me that the mine is in a deplorable condition, hard to get cars, and he didn't see how they was to furnish the coal; that was directly after this I don't know how many days.

Then afterwards still on direct examination:

Q. Now following this letter which was written on the 25th of September in which it was offered to supply or furnish you coal at $1.60 f. o. b. mine, state whether or not on the second day after that this gentle-

man here called you up and talked to you about sup-
plying that coal, and if he did, tell the jury what he
said to you. A. Well, he said it was just as good coal
and as good as the Weir City coal and would fill my
contract and he would make a price at $1.60 f. o. b.
mine.

Q. He said he would fill the contract you say?
A. Yes, sir.

Q. With that coal? A. Yes, sir.

And on cross-examination appellant's testimony
on this point was as follows:

Q. Now you say on the 27th, or within a few days
after you received this letter of the 25th of September,
that Mr. Dusky called you up over the phone and had
a talk with you; is that correct? A. Yes.

Q. And he told you in that conversation that he
couldn't furnish you the coal except at current prices
did he not? A. Did not, sir.

Q. What did he tell you? A. He didn't say a
word about it to me about current prices or anything
else; he never said it, Mr. Suddath, in all my transac-
tions.

Q. Now listen; I am asking you what he did tell
you. A. Well, sir, he never told me anything I remem-
ber about the coal prices at all.

Q. What did he call you up for? A. Well, sir,
it was on some other business; now if Mr. Dusky ever
mentioned that to me I don't remember anything
about it.

Q. What was the occasion of his calling you up?
A. I can't call to mind what it was; but Mr. Dusky
never intimated that to me.

Q. Well, then, will you tell us what he did tell
you? A. I don't know whether he told or whether
I got a telephone message then. Mr. Dusky never done
any such thing.

Q. You testified to that, to Mr. Kemper and my-
self, that you did get a telephone message? A. I un-

derstand that, but you are telling me what he said to me. He never said that to me over the elephone.

Q. What did he say? A. *I don't know.*

Now it was not incumbent upon the plaintiff to show that, in the telephone conversation, he had declined to recognize the contract of July 27 because his letter of the 25th shows that. But it was incumbent upon defendant to show what was said, since he was claiming a new contract was made. Plaintiff's agent, Mr. Dusky, had testified that, in addition to his letter of September 25, he had said over the phone on the 27th he would not furnish the coal under the former offer because of Feagan's delay in accepting it, and a careful analysis of defendant's testimony as to the telephone conversation shows that he does not state what the conversation was, but merely denies that Dusky declined to fill the orders, and, when asked to state what was said which would show whether a new contract as created or not, he replied that *he did not know.*

So that there was no evidence tending to show a contract originating in a letter and completed over the telephone. Hence the court was justified in telling the jury defendant had no contract by which he was to obtain sufficient coal, at $1.60 per ton, to enable him to supply the Normal School. Even if the letter of September 25 was so worded as to lead a reasonable man to think it proposed such a contract, still the acts of both parties show conclusively that they did not so construe it. When each car was ordered, plaintiff acknowledged receipt stating the prices at which it was to be shipped, and defendant allowed it to be shipped without comment or objection. When it was shipped an invoice was sent along showing the price per ton at which it was sold and the defendant received it without objection, disposed of the coal as shipped, and made ten remittances in payment without disputing the prices. These prices were as stated in the petition

and although plaintiff sent defendant a statement on December 1, 1909, showing how his account stood, and, between the first and tenth of each month thereafter, mailed statements of the amount due at the prices claimed in the petition, yet defendant made no objection thereto and continued to order and receive coal and make payments thereon, and it was not until May 21, 1910, two months after the last car had been shipped, that defendant made any complaint or objection whatever. A careful reading of the entire record shows that the judgment was for the right party and that the court did not err in refusing to submit the question of a contract to the jury. Hence we affirm the judgment. All concur.